FILED

2021 Nov-04 PM 01:59
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **SHERRI ELLIS and**<br>**SCOTT PETERS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| | ) | **2:19-CV-01776-CLM** |
| **v.** | ) | |
| | ) | |
| **DR. JOHN CHAMBERS and**<br>**CYNTHIA CHAMBERS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

| | |
|---|---|
| **DR. JOHN CHAMBERS and**<br>**CYNTHIA CHAMBERS,** | ) |
| | ) |
| **Third-Party Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **PREMIER VESTAVIA, LLC d/b/a**<br>**KELLER WILLIAMS VESTAVIA;**<br>**BHM PARTNERS LLC d/b/a**<br>**KELLER WILLIAMS HOMEWOOD,**<br>**and KIM MANGHAM-BARELARE,** | ) |
| | ) |
| **Third-Party Defendants.** | ) |

## <u>MEMORANDUM OPINION</u>

Dr. John Chambers and Cynthia Chambers (the Chambers) signed a contract to buy a house owned by Sherri Ellis and Scott Peters (the Peters). But the Chambers didn't buy the Peters' house, and the Peters later sold it to someone else for less

money.[1] So the Peters have sued the Chambers, claiming: (1) breach of contract, (2) fraudulent inducement, and (3) fraudulent suppression.

The Chambers seek summary judgment on all three counts (doc. 80) and seek to strike expert report/testimony (doc. 95). The Peters seek to exclude paragraphs from Dr. Chambers' declaration and the Chambers' Motion for Summary Judgment (doc. 92) and seek to compel more discovery (doc. 98).

For the reasons explained within, the court will rule as follows:

- The court will **GRANT** the Chambers' motion for summary judgment on all counts (doc. 80).

- The court will **DENY as moot** the Chambers' motion to strike the testimony of Maddox Casey (doc. 95).

- The court will **DENY** the Peters' motion to exclude paragraphs from Dr. Chambers' declaration and from the Chambers' memorandum in support of their motion for summary judgment (doc. 92).

- The court will **DENY** the Peters' motion to compel discovery (doc. 98).

## <u>BACKGROUND</u>

The Chambers live in Indiana, where Dr. Chambers works as a specialty spine surgeon. The Chambers *almost* moved to Alabama, and that 'almost' undergirds this case.

---

[1] Scott Peters and Sherri Ellis were married when these events occurred, so the court calls the plaintiffs "the Peters" and the house in question "the Peters' house" to help the reader.

1. <u>The recruitment</u>: The Alabama Bone & Joint Clinic (ABJC) and Shelby Baptist Hospital (the Hospital) wanted to expand ABJC's spine practice, so they recruited Dr. Chambers and asked him to relocate his practice and his family to Alabama. Dr. Chambers orally accepted their job offer and signed letters of intent. He resigned from his medical practice in Indiana, applied for an Alabama medical license, and applied for hospital privileges in Alabama.

As part of the recruitment, the ABJC introduced the Chambers to a local real estate licensee, Kim Barelare. The Chambers signed a Buyer's Agency Agreement with Barelare and Barelare's brokerage, LAH Real Estate. Barelare later switched brokerages from LAH Real Estate to Keller Williams. The Chambers did not sign a new Buyer's Agency Agreement with Barelare and Keller Williams.

2. <u>The purchase contract</u>: At the same time, the Peters were trying to sell their home. The Peters had an agent, Melvin Upchurch, and they also understood the business—Sherri Ellis held an Alabama residential real estate license, and Scott Peters was the Senior Executive President of Regions Bank in charge of the bank's residential mortgage loan business.

Barelare (the agent assisting the Chambers) told Upchurch (the Peters' agent) that she had buyers who might be interested in the Peters' home, but the Chambers could not make an offer until Dr. Chambers sorted out his future employment. At that time—and later when the Chambers made their offer and signed a contract—

Dr. Chambers had not signed employment contracts with ABJC or the Hospital. Rather, ABJC had *sent* Dr. Chambers an employment contract, and the hospital had not.

With Barelare's help, the Chambers offered to buy the Peters' home. Before submitting the Chambers' official offer, Barelare sent Upchurch a text message that included some terms of the offer. Most relevant, Barelare's text said that a home-inspection contingency would be the only contingency in the offer. Upchurch forwarded the text to Sheri Ellis, who responded, acknowledging that there wouldn't be a contract until everything was in writing.

After negotiations, the Chambers entered a General/Financed Residential Contract (sales contract) with the Peters. The Chambers agreed to purchase the Peters' house for $1.9 million and to purchase $60,000 worth of furniture from the Peters at closing. Along with the home-inspection contingency mentioned in Barelare's text, the sales contract also included a financing contingency that allowed either party to cancel the contract if the Chambers could not obtain financing by the closing date.

3. The failure to obtain financing and purchase the home: The Chambers applied for a conventional loan and a Home Equity Line of Credit. Both lenders granted conditional loan approvals, subject to receipt of Dr. Chambers' completed employment contracts.

Once Dr. Chambers received both employment contracts, he sent them to his lawyer for review. The Chambers had several concerns about the terms of the contracts. So Dr. Chambers did not sign the proposed employment contracts by the original closing date—meaning that the Chambers could not obtain financing to purchase the Peters' house by the original closing date.

The Chambers and the Peters agreed to extend the closing date by about two weeks to give Dr. Chambers additional time to finalize his employment contracts. As consideration for the extension, the Chambers paid the Peters a nonrefundable fee of $5,000.

But the Chambers did not resolve their concerns with the Hospital contract over the next two weeks, meaning that the Chambers' lenders could not finance the loans—and thus the Chambers again failed to obtain financing. So the extended deadline came and went. Less than three weeks later, the Peters signed a contract to sell the home to a different buyer for $1.8 million. This deal (which did not include the $60,000 furniture purchase) closed as planned.

All the while, Dr. Chambers continued negotiating the terms of his employment contracts with ABJC and the Hospital. When those negotiations failed, Dr. Chambers returned to his practice in Indiana and paid $60,000 in attorney fees to reinstate his former partnership.

## STANDARD OF REVIEW

In reviewing a motion for summary judgment, this court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *See Cuesta v. Sch. Bd. of Miami-Dade Cty.*, 285 F.3d 962, 966 (11th Cir. 2002). Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Conclusory allegations and speculation cannot create a genuine issue of material fact. *Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018) (citing *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.")).

## ANALYSIS

The Chambers move for summary judgment on all three claims: (1) breach of the sales contract, (2) fraudulent inducement, and (3) fraudulent suppression and concealment. Before addressing the merits of the summary judgment motion, the court will rule on the motion to strike, motion to exclude, and motion to compel.

## I.     Motion to Strike

The court first addresses the Chambers' motion to strike Maddox Casey's declaration and testimony. Doc. 95. The Chambers seek to strike Casey's report, alleging that: (1) Casey failed to provide all facts and data he considered in forming his opinions (instead only providing bare conclusions devoid of factual or analytical support), (2) Ellis and Peters failed to show Casey's qualifications and reliability under Evidence Rule 702, and (3) Casey's Declaration improperly states new opinions and reasoning improperly excluded from the 26(a) report. *See* Docs. 95 and 106. But even if this court were to consider Casey's testimony, it would not change the result of this opinion. So the court will deny as moot the motion to strike the expert report and testimony of Maddox Casey. Doc. 95.

## II.    Motion to Exclude

Next, the court addresses the Peters' motion to exclude specific paragraphs of Dr. Chambers' declaration and to strike or disregard the Chambers' related argument in their memorandum in support of summary judgment. In response to requests for admission, the Chambers denied that they sought the advice of legal counsel on breach of the sales contract, fraud, suppression, and punitive damages. Doc. 92-2. Dr. Chambers later declared that he sought legal advice about his employment contracts. Doc. 81-16 at 15-20, ¶¶ 38-42. The Chambers then used this information to establish a timeline of events in their memorandum in support of summary

judgment. Doc. 83. The Peters argue that the court should exclude the paragraphs in Dr. Chambers' declaration and the related argument in the memorandum in support of summary judgment because they "directly contradict" the Chambers' answers to requests for admission.

If Rule 36 admissions and subsequent testimony conflict, the Rule 36 admissions control. *See e.g.*, *Williams v. City of Dothan*, 818 F.2d 755, 762 (11th Cir. 1987). But there is no conflict here. The Rule 36 admissions deny that the Chambers sought legal advice on the Peters' legal claims, while the so-called conflicting paragraphs in Dr. Chambers' declaration and in the Chambers' brief (doc. 84 at 4-5, 15 ¶ 28, 21-26) say that the Chambers sought legal advice about Dr. Chambers' employment contracts. Legal advice about terms in an employment contract is different from legal advice about how to defend a lawsuit over a housing contract. Because Dr. Chambers' declaration and the Chambers' memorandum in support of summary judgment do not directly contradict their Rule 36 admissions, the court will deny the Peters' Objection and Request to Exclude (doc. 92).

## III.   Motion to Compel

In their motion to compel, the Peters argue that the court should compel access to all oral and written communications between the Chambers and their lawyer about Dr. Chambers' employment contracts and the sales contract. The Peters argue that the Chambers waived attorney-client privilege. The Peters assert that the Chambers

"are attempting to rely on the legal advice [of counsel as an affirmative defense] to show that Dr. Chambers acted in good faith in declining the employment offered to him" (doc. 92 at p. 5) and that the Chambers waived attorney-client privilege by relying on the lawyer's advice to resolve the issues of the case.

Simply disclosing that they obtained and relied on legal advice does not place the privileged attorney-client communication at issue. *See Ex parte Meadowbrook Ins. Group, Inc.*, 987 So.2d 540, 550-551 (Ala. 2007). The Chambers did not assert a defense of reliance on advice of counsel (doc. 92-2). Nor did the Chambers place the actual legal advice at issue. Whether the Chambers made reasonable good-faith efforts to satisfy the financing contingency does not depend on the actual legal analysis that their attorney provided about the employment contracts.

Contrary to the Peters' claims, Dr. Chambers' declaration only reveals that he sought the advice of counsel for his employment contracts to establish a timeline of events. The declaration does not reveal the contents of the communications. Further, the Chambers did not rely on privileged communications to prove reasonable, good-faith efforts to satisfy the financing contingency.

\* \* \*

The Chambers did not disclose the content of their lawyer's advice, so the court finds that the Chambers did not voluntarily waive attorney-client privilege. Because the Chambers did not voluntarily waive attorney-client privilege, the

Chambers are not relying on the content of their attorney's communications as a defense to the claims, and the lawyer's advice is unnecessary to resolve the issues here, the court will deny the Peters' motion to compel "all oral or written communications" between the Chambers and their legal counsel (doc. 98).

## IV.  Motion for Summary Judgment

### A. Count I: Breach of Contract

To prevail on their breach of contract claim, the Peters must prove: (1) that they had a valid binding contract with the Chambers, (2) that they performed under the contract, (3) that the Chambers did not perform, and (4) that they suffered damages. *See Southern Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995) (citations omitted). The main element in dispute is whether the Chambers performed under the contract. And the Chambers' performance hinges on whether they met the financing contingency and on whether they made a reasonable, good-faith effort to satisfy the employment condition. The court will address each of these issues below.

### 1.  Financing Contingency

The sales contract for the Peters' house included a financing contingency that stated, in relevant part:

> Unless Buyer elects to waive the financing contingency of this contract, either party may cancel this contract if Buyer cannot obtain financing as specified by <u>Closing.</u> In such event, both parties will execute a

> Mutual Release and all Earnest Money shall be promptly returned as per the terms stated in Paragraph 5 below.

Under Alabama law, a financing contingency that makes "the contract subject to the procurement of a loan to finance the purchase price is a valid condition precedent to performance . . . ." *Duncan v. Rossuck*, 621 So. 2d 1313, 1314 (Ala. 1993). "[W]hen a contract makes securing financing a condition precedent to its performance, neither the contract nor any of its provisions become binding obligations unless and until financing is obtained." *Ex parte Bill Heard Chevrolet, Inc.*, 927 So. 2d 792, 799 (Ala. 2005).

While the Chambers were conditionally approved for a loan—that condition being that Dr. Chambers execute his employment contracts with ABJC and the Hospital—a conditional loan approval does not satisfy the condition precedent. *See Khalidi v. Weeks Fam. P'ship*, 912 So. 2d 256, 257 (Ala. Civ. App. 2005) (citing *Carmichael v. Lambert Constr. Co.*, 487 So. 2d 1367 (Ala. Civ. App. 1986)). The Chambers had to actually obtain financing. If they did not, they could cancel the contract.

Dr. Chambers did not execute his employment contracts before the extended closing date, so the lenders could not issue the loans. The Chambers thus failed to obtain a mortgage loan by the closing date. So under the plain language of the contract, the condition precedent was not satisfied.

\* \* \*

In sum, the court finds that the financing contingency was an unambiguous condition precedent to the sales contract and that the condition precedent was not met. The Peters cannot proceed under a theory that the conditional loan approvals satisfied the unambiguous financing contingency.

Nor can they side-step the financing contingency by alleging that the Chambers should have included a separate addendum to the sales contract, specifying an employment contingency. They argue that it is the custom, practice, and usage of trade to include employment contingencies. But the parties did not include an employment contingency in the contract, and with no evidence that such contingencies are part of the custom, practice, or trade usage, this argument fails.

### 2.  Reasonable Good Faith Effort

The Chambers had an implied obligation to make a reasonable, good faith effort to "obtain the requisite financing." *See Schottland v. Lucas*, 396 So. 2d 72, 74 (Ala. 1981) (citation omitted); *Duncan*, 621 So.2d at 1314–15. The Peters argue that Dr. Chambers refused to sign his employment contracts so the Chambers could avoid performing under the residential sales contract, in violation of their duty of good faith. The Chambers counter that when ABJC and the Hospital presented Dr. Chambers with employment contracts that contained unexpected and unfavorable terms, this constituted an unanticipated change in circumstances that justified their

decision not to sign the contracts and excused them from their obligation to buy the Peters' house.

Alabama law does not define what a "good faith" effort is. But the Alabama Supreme Court has found bad faith in these two circumstances: (1) when the buyers fail to file the requisite paperwork to secure financing (*see Schottland*, 396 So. 2d at 74), and (2) when the buyers sabotage the financing to avoid following through with the sales contract because they have become "disenchanted" with the home (*see Duncan*, 621 So.2d at 1314). The Peters fail to present evidence that would allow a reasonable juror to determine that the Chambers acted in bad faith under either scenario. It is undisputed that the Chambers filled out all paperwork to secure financing, both on the original loan and on the bridge loan. So the Peters cannot prove bad faith under *Schottland*.

And the Peters present no evidence that Dr. Chambers refused to sign his employment contracts (and thus obtain financing) because the Chambers were disenchanted with the Peters' home or with the terms of the sales contract. So the Peters cannot prove bad faith under *Duncan*.

In fact, there is substantial evidence that the Chambers *wanted* to buy and live in the Peters' house. Dr. Chambers resigned from his medical practice in Indiana. He applied for an Alabama medical license and for privileges in Alabama hospitals. The Chambers took trips to Alabama to secure housing, schools, and extracurricular

activities for the children. When the Chambers realized that problems with the employment contracts might not be resolved by the closing date, they applied for a bridge loan to facilitate a faster closing. Then, when the Chambers knew that the contract issues would last through closing, they paid the Peters $5,000 to extend the closing deadline so they would have time to resolve the lingering issues. Plus, all the loan officers involved testified that the Chambers acted in good faith. This evidence indicates that the Chambers intended to follow through with the housing contract if Dr. Chambers could work out his contractual issues with his prospective employers.

Further, the Alabama Supreme Court has said that if a buyer fails to buy a house because the buyer's employment plans changed, that is not bad faith. *See Carmichael*, 487 So.2d at 1369. The Peters signed a contract to sell their house to other buyers just three weeks after the Chambers missed the extended closing date. If the Chambers avoided financing because they did not want to buy the Peters' house, as the Peters allege, you would expect Dr. Chambers to have immediately signed the employment contracts so he could buy a different house in the Birmingham area. But he didn't. Dr. Chambers instead rejected the employment contracts and bought back into his Indiana practice. In short, the evidence shows that the Chambers' inability to obtain financing stemmed from Dr. Chambers' contractual dispute with his prospective employers, not with the Chambers' desire to get out of the sales contract with the Peters.

* * *

The evidence supports only one reasonable inference: The Chambers made a reasonable, good-faith effort to obtain financing in accordance with the sales contract but failed to do so due to an employment-related dispute. The Chambers are entitled to summary judgment on Count I because (a) the Peters failed to show that the financing contingency was met, and (b) they provided no evidence that the Chambers acted in bad faith.

## B. Counts II and III: Fraudulent Inducement and Fraudulent Suppression

The Peters assert fraudulent inducement and fraudulent suppression claims, arguing that the Chambers—through Barelare—withheld information and purposefully misled the Peters about the status of Dr. Chambers' employment contracts and about the presence of a financing contingency, so that the Peters would sign a sales contract that they would not have agreed to otherwise. Barelare's oral and written communications provide the bases for these claims.

1. <u>Agency Relationship</u>: Under the Alabama Real Estate Consumer's Agency and Disclosure Act (Act), an agency relationship between a consumer and a real estate licensee exists only when there is a written, signed agency agreement. *See* Code 1975, § 34-27-80 *et seq*.

> At the initial contact between a licensee and the consumer and until such time a broker enters into a specific written agreement to establish an agency relationship with one or more of the parties to a transaction,

> the licensee shall not be considered an agent of that consumer. An agency relationship shall not be assumed, implied, or created without a written bilateral agreement establishing the terms of the agency relationship.

Code 1975 § 34-27-82(b). If there is no written, signed agency agreement, then by default, the real estate licensee acts as a transactional broker in relationship to the consumer. When serving in a transactional broker capacity, the licensee assists the consumer in the real estate transaction, but is not the consumer's agent, does not owe the consumer fiduciary duties, and is not the consumer's advocate. Ala. Code § 34-27-81; 34-27-82(e). This Act supersedes all inconsistent common law agency principles. *See* Ala. Code § 34-27-87.

When Barelare made the alleged misrepresentations or omissions, she did not have a written, signed Buyer's Agency Agreement in place. It is true, as the Peters note, that Barelare entered a written, signed agency agreement with the Chambers when she was affiliated with the brokerage LAH Real Estate. (A flood destroyed this document.) Then, before she made the statements at issue, Barelare moved to Keller Williams. The Chambers did not enter a written, signed agreement with Barelare and Keller Williams.

Whether the Chambers signed an agency agreement with LAH Real Estate is irrelevant because the agency agreement is an agreement between the brokerage and the client, authorizing the licensee to act as the client's agent. The Chambers' signed agreement with LAH Real Estate did not transfer to Keller Williams just because

16

Barelare did. So, Barelare—as a licensee affiliated with Keller Williams—had no agency authority to act on the Chambers' behalf. Rather, Barelare was a transactional broker.

So even if Barelare represented to the Peters or their agent that Dr. Chambers finalized his employment contracts or that there were no contingencies other than a home inspection, Barelare's written and oral communications are not binding on the Chambers and cannot be imputed to the Chambers. And the Peters' arguments that Barelare had express, implied, or apparent authority to communicate on the Chambers' behalf fail because the Act supersedes all inconsistent common-law principles of agency.

2. <u>Written contract</u>: Even if Barelare acted as the Chambers' agent in her communications, the fraud claims would still fail as a matter of law because the sales contract supersedes all previous text messages that Barelare sent to Upchurch. And the Peters—as sophisticated sellers—should have known that the written financing contingency would have legal effect and that the Chambers would not be bound by the contract if they could not obtain financing by the specified closing date.

* * *

For either of these reasons, the Chambers are entitled to summary judgment on Counts II and III.

17

## CONCLUSION

For the reasons stated above, the court will **GRANT** the Chambers' motion for summary judgment on all counts. The court will **DENY as moot** the Chambers' motion to strike the expert testimony and report of Maddox Casey. The court will **DENY** the Peters' motion to exclude paragraphs from Dr. Chambers' declaration and from the Chambers' memorandum in support of their motion for summary judgment. The court will **DENY** the Peters' motion to compel discovery. The court will enter a separate order consistent with this memorandum opinion.

**DONE** on November 4, 2021.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE